**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-mj-00403 (RMM)** |
| v. | : | |
| | : | |
| LANDON KENNETH COPELAND, | : | |
| | : | |
| Defendants. | : | |

<u>**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**</u>

In the three months since his arrest for offenses at the U.S. Capitol on January 6, 2021, the defendant has made clear that he poses a danger to the community and that he will not abide by conditions of release. He has spoken at length to members of the news media about both his conduct on January 6, 2021, in Washington, D.C., and his conduct on May 6, 2021, when he violated his conditions of release. The defendant views all of his conduct, on both dates, as justified. In his own words, if given the chance to go back in time to January 6, 2021, the defendant would choose—again—to assault members of law enforcement:

| | |
|---|---|
| The Defendant: | Whatever the cost, I would willingly do it again for the people I love. |
| Reporter: | Okay. You'd do it again? You'd go back to D.C.? |
| The Defendant: | I would do it all again for the people that I love. To defend those people against the attacks they were receiving? I would do it all again. To defend my people from the laws of tyranny that had been made? I would do it all again. |

The defendant also views conditions of release, generally, as unjustified infringements on his liberty. He has demonstrated that he will not abide by them and has falsely denied threatening the pretrial services officer on May 6. The defendant shows no interest in or willingness to reflect on his conduct, or to conform his behavior to the requirements of supervision. Accordingly, the Court should find that "no condition or combination of conditions will reasonably assure . . . the safety

1

of any other person and the community," 18 U.S.C. §3142(e), should further find that he has violated the conditions of his release, pursuant to 18 U.S.C. §3142(b), and should order him detained pending trial.

### A. Factual background

#### A. The offense

On January 6, 2021, thousands of rioters descended upon the U.S. Capitol in an effort to disrupt the peaceful transfer of power after the November 3, 2020, Presidential election. The defendant was among them. The government's evidence does not show that he entered the Capitol building; rather, he remained on the grounds and joined with the rioters who attacked law enforcement officers.

For the defendant, this was not a spur-of-the-moment trip. He lives in a community on the Utah / Arizona border known as Short Creek, about 2,300 miles from the Capitol building.[1] To be present in Washington, D.C. on January 6, 2021, the defendant took a week's vacation from work and drove across the country. On January 6, 2021, following the former President's rally at the White House, the defendant traveled to the U.S. Capitol grounds. There, in an area near the Lower West Terrace, he assaulted law enforcement officers. The defendant's actions were captured on video.

The defendant appeared to be part of a group that was trying to breach the police line. At the front of this crowd, the defendant shouted at the officers; he was visibly angry. Shortly thereafter, another rioter approached a police officer, began shouting at the officer, and put his hands on or around the officer's neck. Copeland pushed that other rioter, from behind, into the

---

[1] "Short Creek" includes the encompasses the border cities of Colorado City, Arizona and Hildale, Utah.

officer, causing that officer to fall to the ground. After this, other officers stepped forward in an apparent attempt to protect the fallen officer. Copeland grappled with and pushed them, grabbing onto one officer's riot shield, another officer's jacket, and then pushing against the riot shields of two other officers.

On another occasion, the defendant and other rioters had grabbed a metal fence serving as a barricade and tried to pull that barricade away from law enforcement officers. Body-worn camera footage reveals that, immediately before the defendant grabbed the barricade, it was stationary, with its base "feet" on the ground. Another rioter grabbed at the barricade, knocking it over, and the defendant immediately sought to help take it away from the police. This led to a struggle over the barricade between multiple officers and multiple rioters, including the defendant. One or more of the officers deployed OC spray against those rioters, including the defendant. In response, the defendant pushed or threw the fence toward multiple law enforcement officers.

### B.  The Defendant's Interview with FBI and Arrest

On February 11, 2021, the FBI interviewed the defendant in southern Utah. The defendant admitted that he traveled to Washington, D.C. to attend the former President's rally on January 6, 2021, and that he was present in a crowd of people outside the Capitol building. The defendant identified himself in the photographs which are embedded in the criminal complaint and in the videos from which those photographs were taken. He admitted to fighting with police officers and told the FBI that police officers were trying to "penetrate the line" of protesters and "steal" individual members of the crowd, including one person who the defendant described as having been shot in the face by an officer. The defendant said that he did not enter the Capitol building on January 6, 2021.

The FBI later learned that, shortly before this interview, the defendant sent the following text message to a group of friends: "To all of you out there please keep your rifles loaded and your heads down.  I go to meet with the FBI in 15 minutes. Thanks for the portion of my life I shared with you. May god bless you and your lovely family. I don't know what's gonna happen in here but please don't let them steal my truck and stuff. Its parked on the third floor of the parking garage on the west side.  The address is 20 N Main St, St. George, UT, 84770.  Sincerely, Former US Army SGT. Landon K. Copeland"

The defendant voluntarily surrendered to the FBI on April 28, 2021 and made his initial appearance before a magistrate judge in Utah on April 29. In a Facebook post on April 28, 2021, before his initial appearance, the defendant wrote "So that everyone knows I go to see the FBI and a judge tomorrow. I guess peacefully protesting at the Capitol is now illegal and they are trying to hunt us all down to try and teach us a lesson. Unfortunately only one option remains when we return. We bring guns and take the Capitol building without intention of being peaceful. This ends with the government bombing their own people. I had hopes it wouldn't. But here we are."

### C.  The May 6, 2021 Hearing

On May 6, 2021, the defendant appeared before this Court for his initial appearance in Washington, D.C. Six other defendants were also scheduled for initial appearances in cases arising out of the January 6, 2021, riot at the Capitol; defendant Copeland's hearing was scheduled seventh and last. The defendant spoke throughout the hearings, often interrupting the hearings for the other defendants.

During a general colloquy with all defendants, explaining the day's procedure, the defendant interrupted the Court to ask "At what point am I a free individual versus a pre-trial confined individual?" *United States v. Landon Kenneth Copeland*, 1:21-cr-00403 (RMM), Tr.

4

05/06/2021 at 7. The Courtroom Deputy admonished the defendant, telling him that "we can't have these interruptions or we are not going to get through the calendar today." *Id.* at 9. Defense counsel asked for the defendant to be "mute[d] … until his case is called," and the defendant replied, "No! No! No! No! No! No! No! No! I will keep my mouth shut. I promise." *Id.*

The defendant broke his promise, moments later, when he interrupted the Court to ask "[i]s any of this negotiable?" *Id.* at 10. During the first hearing, for defendant Antonio, the defendant interrupted to object when counsel for Mr. Antonio claimed that his client became hooked on Fox News and acquired "Foxitis or Foxmania." *United States v. Anthony Alexander Antonio*, 1:21-mj-00375, Tr. 05/06/2021 at 18-19. The defendant interrupted Mr. Antonio's counsel again, moments later; the Court directed that the Courtroom Deputy mute him. *Id.* at 19-20. During the second hearing, the defendant interrupted to ask the Court for an email address. *United States v. William Tryon*, 1:21-mj-00320, Tr. 05/06/2021 at 22-23. During the third hearing, the defendant did not have himself muted, and noise could be heard through his phone. *United States v. Albuquerque Cosper Head*, 1:21-cr-00291, Tr. 05/06/2021 at 14, 23. He also interrupted the hearing to volunteer that he was still present. *Id.* at 24. The next three hearings passed without interruption from Mr. Copeland.[2]

Once his own hearing began, the defendant was immediately combative with the Court. The hearing began with the following exchange:

| The Defendant: | Before we get started, how long can I postpone this thing? |
|---|---|
| The Court: | You're scheduled for this hearing to go forward. |
| The Defendant: | Well, I need – [Inaudible] – and I need a bunch of stuff, and I'm a veteran and you owe this to me. And I don't like you |

---

[2] *United States v. Esther Schwemmer*, 1:21-mj-00377, Tr. 05/06/2021; *United States v. Jennifer Ruth Parks*, 1:21-mj-00378, Tr. 05/06/2021; and *United States v. Elijah Yazdani*, 1:21-mj-00406, Tr. 05/06/2021.

|   | people. You telling us what to do and pointing guns at us and stuff. I need some help. You people done just fucked this thing up somehow. |
|---|---|
| The Court: | Mr. Copeland, first of all – |
| The Defendant: | -- I don't know who you are but you are a robot to me. I am clear out here in the middle of the desert, in no man's land. You can't come get me if I don't want you to. You can't come kill me if I don't want you to. You can't take nothing from me that I don't want you to. So I am going to say this, you are going to give me a psych eval. You are going to give me all kinds of shit. You are going to give me everything to protect my rights and make sure I am a stable individual that doesn't like his Government coming and pointing guns at him and fucking stealing all of his money; 70 percent. Seven zero percent of my income returns to my Government through wealth distribution plans, through child support, through taxes. Fuck all of you. And I make $15 an hour. Fuck all of you. I am telling you what, come fuck with me. |
| The Court: | Mr. Copeland. Mr. Copeland. Ms. Kay, could you mute Mr. Copeland? |
| The Defendant: | Come get me fuckers. Come get me! |

*United States v. Landon Kenneth Copeland*, 1:21-cr-00403 (RMM), Tr. 05/06/2021 at 15-16. The defendant again interrupted the Court, and swore at the Court, after the Court proposed a break to allow the defendant to speak privately with his attorney. *Id.* at 19. Then, when the matter was recalled, he became incensed that the Court was using the "wrong" case number (i.e., the D.C. case number, instead of the Utah case number), appeared to suggest this was part of a coverup, and swore at the Court again. *Id.* at 20-21. He disconnected from the hearing after his attorney claimed he was in crisis, *id.* at 24, then called back to swear at the court again, accuse "[y]ou guys" (presumably, the Government and Court) of "killing your own people," and then hung up again. *Id.* at 30-31.

### D.  The Defendant's May 6, 2021 Threats Against His Pretrial Services Officer

At some point during the May 6, 2021 hearings, the defendant called his Pretrial Services Officer in Utah ("the PSO"). The defendant told the PSO that "I want to speak" and "I want to be heard"; he also said that he was at the edge of a cliff and "ready to finish it." (PSO Report at 1.) After the hearing, the defendant sent his PSO a text message saying "Tell them I want to speak, or I will die for it!" He went on to say "If they issue a warrant, they will have to come and get me, and it won't be easy." *Id.*

During the hearing, the defendant drove to the PSO's office. While on his way to the office, the defendant called the PSO and told the PSO that the Court had cut him off, and he was coming to the PSO's office so that they (Pretrial) could make the Court listen. After he arrived, he spoke with the PSO through the security glass barrier. *Id.* The defendant began ranting about government conspiracies and claimed that everything was being taken from him, and the government was out to get him. *Id.* At times, he banged his head against the glass and pressed his face against the glass. *Id.* He told the PSO that "If I was on the other side of this glass, I would eat you from the inside out because I am starving," and went on to say "Fuck all of you, and fuck every single one of you." *Id.* This behavior continued for approximately 15 minutes, after which time another PSO told the defendant that the day was over and the staff had to leave. *Id.* According to the PSO, the defendant departed and the PSOs were able to leave without incident.[3]

This defendant's behavior prompted the PSO to submit a report arguing that "the U.S. Probation Office does not believe that any single condition or set of conditions can minimize the risk this defendant poses to officers and to the community at large." (*Id.* at 2.) The PSO opined

---

[3] The PSO informed the government that when they learned that the defendant was coming to the office, they had called the U.S. Marshal's Service. A Deputy U.S. Marshal sat outside of the office and watched the defendant leave.

that the defendant might hurt or kill someone if allowed to remain on release. (*Id.*) In response to this report, Magistrate Judge Kohler issued a warrant for the defendant's arrest.

### E.  The Defendant's Arrest and the May 12 Hearing

The defendant was arrested on May 11, 2021 and appeared before Magistrate Judge Kohler on May 12. At the hearing, and without prompting, the defendant explained one of his outbursts during the May 6 hearing. He volunteered that his actions were "intentional," and said that "they" [the attorney who claimed his client had "Foxitis"] "lambasted 250,000,000 people as having some sort of mental disease that tune into the Tucker Carlson nightly news show every night. I couldn't stand for that, Your Honor." *United States v. Landon Kenneth Copeland*, 4:21-mj-00030 (PK), Tr. 05/12/2021 at 4-5.[4]

### F.  The Defendant's Subsequent Interviews

On May 14, 2021, the defendant interviewed with reporter Nate Carlisle of Fox 13, which is based in Utah. They spoke for at least 45 minutes. On June 4, 2021, the defendant interviewed with Scott MacFarlane of NBC Washington. They spoke for approximately 30 minutes. In both interviews, the defendant spoke about his conduct on January 6, his motivations for traveling to the Capitol, and the events of May 6. Because the interviews substantially overlap in substance, this memorandum organizes them by topic area, below.

#### a.  The Defendant's Statements about his Conduct on January 6, 2021

The defendant admitted to physical interactions with law enforcement officers, although he said that he "[didn't] think [he] committed a crime." He added that "you know, I have the

---

[4] According to Forbes.com, the Tucker Carlson show has an average audience of more than three million viewers—a large number, but far short of 250 million. https://www.forbes.com/sites/markjoyella/2021/04/27/tucker-carlson-leads-fox-news-to-big-win-in-april-prime-time-ratings/?sh=1a9bc6a76cb2

capability of where I could have hurt those other individuals [the officers]. But I didn't hurt them." The defendant further explained that he clashed with officers because he saw them "stealing" members of the crowd, and then made clear that he was using the word "steal" to mean "arrest":

> To me, that's stealing people like that, arresting them. To me, I call it stealing people. Because you literally steal them out of their life. Because they arrested me now, I literally won't get to see the birth of my daughter on July 25.

The defendant claimed that a person standing near him was shot in the face, and after this, an officer instructed another nearby individual to "come with me." When the officer reached out to touch this person, the defendant "lost control and started forcing [the officers] out of the crowd toward their own police line." According to the defendant, one officer started hitting him in the legs with a baton; he took the baton. Another officer pushed him with a riot shield; he took the shield. The defendant said that, thereafter, he was shot in the back with a rubber ball grenade. He decided that "I'm going to get myself killed if I don't stop"; found his girlfriend, who had accompanied him on the trip; and left.

The defendant also admitted to struggling with officers over a crowd control gate. He claimed that the officers were holding the gate up and using the feet to stab at people, so he and another person tried to take it from them.[5] When the officers deployed pepper spray, the defendant picked up the crowd control gate and tried to toss it over them.

Speaking with Mr. MacFarlane, the defendant also justified his behavior by comparison to a famous instance of police brutality. After hearing the defendant's explanation of what happened, Mr. MacFarlane asked, "but they're the police, though. You understand that part of it." The defendant replied "Well I do understand they're the police, but at the same time, it was a cop who

---

[5] Body-worn camera footage disproves this claim.

killed Derek Chauvin.[6] I mean, am I supposed to just let them go around and kneel on everybody's neck, and stand there and watch them, until they're dead?"

### b. The Defendant's Reasons for Travel to the Capitol

The defendant said that he traveled to the Capitol in part because former President Trump ordered him and others to be there.[7] He estimated that, on the day of the riot, the crowd numbered between three and five million people. Despite his perception of the crowd's size, the defendant claimed to expect that he and members of the crowd could simply enter the building, sit down with Members of Congress, and say "let's just discuss the election, and what's happened … let's postpone this thing momentarily so we can have a true investigation into the voter fraud." The defendant said he was surprised to be stopped outside the Capitol by law enforcement, and asked why he couldn't get in, saying "It [the building] doesn't belong to you. It belongs to us, the people."

The defendant also repeatedly referred to Members of Congress as authoritarians, and U.S. law as tyranny. He referred to police as the "dogmen" of a tyrannical government. He claimed that, in light of the former President's request that his supporters to go to the Capitol, law enforcement did not have the authority to bar visitors. He also claimed that the person who ordered visitors barred "is the murderer of Ms. Ashli Babbitt." But in spite of these incendiary claims, the defendant also maintained that if he had the opportunity to speak with Members of Congress, and those Members told him that they would certify the electoral vote despite his objection, he would have walked out of the Capitol building and felt better for being heard.

---

[6] Obviously, this was an error: earlier this year, Derek Chauvin, a police officer, was convicted of murdering George Floyd.

[7] At other times, the defendant said he wanted to confront lawmakers about police brutality, and also wanted to tell them "we're not getting what we want from [you], we want less limitations on our business and on our private lives."

### c.  The Defendant's Account of May 6, 2021

The defendant explained that he became angry during the May 6 hearing before this Court because "they" were "allowed to appeal to the left-leaning biases of that Court so heavily." By this, the defendant referred to a moment in *United States v. Antonio*, 1:21-mj-00375, when defense counsel claimed that Mr. Antonio had "Foxitis." Copeland added that this comment was "spitting in the face of the 258 million people that tune in to the Tucker Carlson show," that Fox News is the most watched news station on Earth, and that this attorney was allowed to lambaste all of Fox News' viewers without objection from the judge or any of the other attorneys present.

The defendant also claimed he did not threaten his PSO. He acknowledged speaking to the PSO, and said "I can give you the verbatim quote. It was 'I would eat your flesh for nutrients. I don't think you know what I am.'" The defendant failed to explain how this language was less threatening, or indeed different in substance at all, from what the PSO reported. Instead, he maintained that "I was well within my First Amendment rights in speaking to him the way I did."

When a reporter asked the defendant if he planned to stay quiet for the rest of the court hearings in his case, the defendant replied, "Well, absolutely, so long as they don't attack people with false allegations, including myself." The interviewer pointed out that the defendant was "leaving a big hole there, because one of the things they work out in court is what the facts are." To which the defendant replied, "Well, I mean, as long as you know what the facts are, and you state only the facts, I remain pleasant. But as soon as you don't state facts . . ."

### d.  The Defendant's Statements about Government Authority Generally

Throughout the interview, the defendant repeatedly expressed opposition to the authority of various government actors. He described his pretrial release as "punishment without conviction," and said that he "feel[s] like there's a bunch of federal laws against that." He also

claimed that his ongoing child support obligations were unfair treatment of him specifically, and like cases represented unfair treatment of men generally.

### B. Analysis

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, authorizes the detention of defendants awaiting trial on a federal offense under certain, limited circumstances. The procedural posture of this case is somewhat unusual. On April 29, 2021, the defendant was released by Magistrate Judge Kohler with instructions to appear, virtually, before this Court on May 6. The defendant began his initial appearance before this Court on May 6, but never completed it due to the conduct described above. This Court, therefore, never ordered conditions of release. But, because of the defendant's threats against his PSO, the PSO sought revocation before Judge Kohler, who issued a warrant for the defendant's arrest. The defendant was arrested on May 12, 2021, and appeared before Judge Kohler, who issued a temporary order of detention. *United States v. Landon Kenneth Copeland*, 4:21-mj-00030 (PK), Dkt. 11-12. The defendant appeared before Judge Kohler again on May 17, 2021. The defendant did not admit or deny the PSO's revocation request, and Judge Kohler issued an order of temporary detention pending the defendant's appearance in Washington, D.C. *Id.*, Dkt. 15, 17. The undersigned recalls that Judge Kohler intended to allow this Court to have the final say on the defendant's detention or release. But, since the defendant's arrest, this Court has been dealing with issues of competence. The Court never concluded the defendant's initial appearance, and therefore never imposed conditions of release.

Accordingly, here, the government seeks detention under two provisions of the Bail Reform Act. First, it seeks detention pursuant to 18 U.S.C. § 3142(f)(1)(A), because the defendant is charged with a crime of violence. Second, the government seeks revocation of the defendant's release under 18 U.S.C. § 3148(b), because the defendant violated his conditions of release by

threatening his PSO. Either statute supports the defendant's detention. And, as outlined below, a presumption in favor of detention exists under either provision.

As to detention pursuant to § 3142(f)(1)(A), a crime of violence includes, among other things "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 3156(a)(4)(A). Here, that test is met: the defendant is charged with violations of 18 U.S.C. § 111(a)(1) and 231(a)(3). The charging language in the complaint specifically alleges that the defendant's conduct as to the 111(a)(1) count involved "physical contact with the victims and the intent to commit another felony," and further alleges as to the 231(a)(3) count that the defendant "commit[ted] an act to obstruct, impede, and interfere with law enforcement officials lawfully engaged in the performance of their official duties . . . ."

Where the act authorizes pretrial detention, the judicial officer must hold a hearing to determine whether there are conditions of release that would reasonably assure the appearance of the defendant as required and the safety of any other person and the community. 18 U.S.C. § 3142(f). If the judicial officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer shall order the person detained pending trial. § 3142(e)(1). A finding that no condition or combination of conditions would reasonably ensure the safety of any other person and the community must be supported by clear and convincing evidence. § 3142(f).

In some cases, Bail Reform Act establishes a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community. § 3142(e). As noted below, at the time of this offense, the defendant was on release pending trial for three sets of local offenses, which gives rise to such a rebuttable presumption

here. § 3142(e)(1)(A). But even if the presumption did not apply, the factors set forth in § 3142(g) strongly support pretrial detention. Those factors include "(1) the nature and circumstances of the offense charged . . . ; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4), the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

As to revocation pursuant to § 3148(b), the defendant's PSO initiated revocation proceedings on May 6, 2021, following the defendant's threat. In Utah, Magistrate Judge Kohler issued a warrant for the defendant's arrest based on his violation. On May 12, 2021, when the defendant was brought before Judge Kohler following his arrest, defense counsel sought a hearing detention hearing in the District of Columbia, and Judge Kohler issued a denial on the defendant's behalf to the allegations in the petition for revocation of supervised release. *United States v. Landon Kenneth Copeland*, 4:21-cr-00030 (PK), Tr. 05/12/2021 at 11-12.[8]

The Court must order the defendant's detention if, after a hearing, the Court finds first, either probable cause that the defendant committed a crime while on release, or clear and convincing evidence that the defendant violated any other condition of release; and second, either that there is no condition or combination of conditions that will assure the defendant will not flee or pose a danger to the safety of any other person and the community, or that the defendant is unlikely to abide by any condition or combination of conditions of release. 18 U.S.C. § 3148(b)(1)(A-B). And, where a person commits a felony while on release, "a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community." § 3148(b). It is a felony to

---

[8] It appears that defense counsel may have been requesting a detention hearing pursuant to 18 U.S.C. § 3142(f), but that Judge Kohler may have been anticipating a hearing pursuant to 18 U.S.C. § 3148(b). The record is not clear on this point.

threaten violence against an officer of the United States while such officer is engaged in the performance of their official duties, or on account of their official duties. 18 U.S.C. §§ 111(a)(1), 1114. The defendant's PSO unquestionably falls into this category; if the Court credits his allegations, the Court would by consequence find probable cause that the defendant committed a felony on release. This, in turn, would trigger a rebuttable presumption in favor of detention.

### 1.  Pretrial Detention Pursuant to 18 U.S.C. § 3142(e)

#### a.  The Nature and Circumstances of the Offense Charged

Here, the offense charged is a violent felony: assaulting law enforcement officers. And, although the defendant claims that he was trying to stop officers from "stealing" members from the crowd, video evidence makes clear that he was the initial aggressor. He approached the police line, shouting; he pushed another rioter into an officer, while that rioter had his hands around or near another officer's throat. The defendant's claim that he was protecting others is flatly untrue. Instead, he started a brawl. The defendant also lied when he claimed that, in the barricade incident, he was protecting the crowd from officers who were using the barricades as weapons. Instead, the defendant and another rioter tried to steal a stationary barricade from an officer.

In his interviews, the defendant offers a variety of justifications for his conduct. But none of these justifications withstands any scrutiny. He claimed he was defending others, but then made clear that he was defending them *against being arrested*, a legitimate police function.[9] He claimed

---

[9] Additionally, the defendant's statements can be seen as raising a claim that he acted in defense of another. "[E]very person has the right to use a reasonable amount of force in defense of another person if he, one, actually believes that the other person is in imminent danger of bodily harm; two, he has reasonable grounds for that belief; and three, *the other person has a right to self-defense*. *Lee v. United States*, 61 A.3d 655, 658 (D.C. 2013) (emphasis in original); *see. Rude v. Adeboyeku*, 552 F. Supp. 2d 32, 36 (D.D.C. 2008) (articulating the same principle in a civil case). But the other rioters, whom the defendant claims he was protecting, had no general right to resist arrest by physical force. *See United States v. Middleton*, 690 F.2d 820, 826 (11th Cir. 1982) (rejecting self-defense defense against resisting arrest where the defendant presented no evidence

he could have hurt officers, but chose not to; as a defense, this statement is farcical. He claimed that he was following the former President's orders to be present at the Capitol, and that the officers were violating orders from their Commander-in-Chief. But this makes no sense. The defendant, a veteran, had been dishonorably discharged years before this riot. He would have understood that the police do not answer to the President, that he was no longer a soldier and thus did not take orders from the President (nor anyone), and that, in any event, a request made at a political rally was not a military order.[10] Instead, it appears that these views were shaped by the defendant's ideology: that the government was tyrannical, and the police officers were its dogmen.

Additionally, the defendant's the trip to Washington, D.C. took substantial planning. The defendant traveled from southern Utah, near St. George, to Washington, D.C., a round trip of more than 4,500 miles. The defendant took a week off work and drove, with others, for three days each way. Whether or not the defendant planned to fight law enforcement officers, his presence in the Capitol was not a lark.

This factor weighs strongly in favor of detention.

### b.  The Weight of the Evidence

The weight of the evidence in this case is overwhelming. Video captures the defendant assaulting police officers, and it makes clear that he did not act in self-defense or defense of another. The government's evidence thoroughly confirms the defendant's identity, and the

---

of unlawful force by officers); *cf. United States v. Span*, 970 F.2d 573, 579-80 (9th Cir. 1992) (discussing "limited right to offer reasonable resistance to an arrest that is an officer's personal frolic").

[10] Even if the Court accepts that the defendant was speaking in good faith about his view of the former President's supposed orders, this factor would not weigh in favor of release. "If defendant truly believes that the only reason he participated in an assault on the U.S. Capitol was to comply with President Trump's orders, this shows defendant's inability (or refusal) to exercise his independent judgment and conform his behavior to the law." *United States v. Chansley*, 1:21-cr-00003 (RCL), Mem. Op. 03/08/21 at at 19-20.

defendant has admitted that the videos record his conduct. This factor weighs strongly in favor of detention.

### c.  History and Characteristics

#### 1.  The Defendant's Statements about This Offense

The defendant has spoken at length about his views on this case, his conduct, and his behavior since arrest. He views his own conduct through the most charitable lens possible, and the government's conduct as tyrannical. He views himself as justified in responding to any perceived slight with anger and physical force. Put simply, these views demonstrate an unwillingness to conform his conduct to the law or to court orders, an unwillingness to comply with terms of supervision, and strongly counsel pretrial detention.

The defendant's conduct on January 6 already shows a lack of respect for law enforcement and a willingness to flout their authority. He has violated the terms of his supervised release by threatening his PSO. And months after his conduct, with time for reflection, he maintained that his actions were justified, and showed no willingness to see anything problematic about his behavior. Talking about January 6, he would "do it all again." Talking about his PSO, he acknowledged saying "I would eat your flesh for its nutrients. I don't think you know what I am." But he claimed this was not a threat. Instead, the defendant acknowledged these were "inappropriate words, I suppose," but maintained he was within his rights to speak this way.

The defendant also is unwilling to acknowledge how dangerous the riot was. He claimed "no one really harmed any of those officers." But, as has been well and extensively documented, this is false. Information about the damage caused by this riot is readily available to anyone with an interest in finding it. But as the defendant has demonstrated through his words and conduct, he would rather believe in his own righteousness than acknowledge the truth.

Similarly, the defendant shows no regret for saying things to this Court like "You're going to give me what the fuck I want! You're going to do what the fuck I tell you to do" and "Fuck all of you all!" He does not even seem to find this language problematic. Instead, he views it as justified by the Court's supposed "left-leaning biases," which he saw in the Court's (appropriate) failure to engage with a silly claim raised by a different lawyer in a different case. Indeed, the defendant claims that when swearing at this Court, he was simply defending others from the mean things this other lawyer said. And he will only stay quiet at future court hearings "so long as they don't attack people with false allegations"—which, in the defendant's mind, includes the charges brought against him.

The defendant also claimed that he, and probably others, would have left peacefully if only they had the chance to sit down and talk with lawmakers. This beggars belief. The defendant was motivated, in part, by the false belief that an election was stolen from the former President. Other rioters too, were motivated by this false belief. The defendant traveled more than 4,500 miles, round trip, to be present at the Capitol on January 6, 2021. He called the Members of Congress tyrants, called the officers protecting them dogmen, and assaulted police officers. Other rioters, who got inside the building, caused property damage and left death threats for members of Congress. In short, the defendant physically demonstrated what he thought of people representing the United States government, and how he would have interacted with Members of Congress if given the chance.

Finally, the defendant plans to take this case to trial because he doesn't like policing in America, recent laws that have been passed, and higher taxation. He thinks a jury will side with him because "I don't believe anybody likes what the badge has done to anyone in the last few years." The defendant is, of course, entitled to exercise his Constitutional right to a trial by jury.

But his political opinions do not present a defense to assaulting police officers during a riot, and his claim is a *non sequitur* to the actual questions which a jury will be asked to decide.

To cast himself as a hero, the defendant has blinded himself to reality. While engaging in such thorough self-justification, he cannot be trusted to abide by any conditions of pretrial release. *Cf. Chansley*, Mem. Op. 03/08/21 at 21 ("The statements the defendant has made to the public from jail show that defendant does not fully appreciate the severity of the allegations against him. To the contrary, he believes that *he*—not the American people or the members of Congress—was the victim on January 6.").

### 2.   The Defendant's Other History

In addition to the defendant's statements about this offense, other aspects of his history weigh in favor of pretrial detention. He has a long history of drug use, which shows a history of violating federal law. *See Chansley*, Mem. Op. 03/08/21 at 25-26. Indeed, the FBI agent who arrested the defendant reported that he smelled of marijuana at arrest, and the defendant's PSO reported that he smelled of marijuana during his initial interview. He was dishonorably discharged from the United States Army after being convicted, at court martial, of distributing marijuana and related offenses. (Dkt. 6 at 5.) In North Dakota, the defendant was convicted of carrying a concealed weapon (misdemeanor) in 2014, disorderly conduct in 2015, and driving under the influence (a separate case) in 2015. The defendant also appears to have an open case in North Dakota, from 2015, for leaving the scene of an accident and related offenses; a warrant was issued for his failure to appear on October 8, 2015. In Arizona, he has a 2017 conviction for criminal trespass.[11] In Missouri, the defendant was convicted of driving while revoked or suspended in

---

[11] The information from North Dakota and Arizona does not appear in the D.C. Pretrial Services Report. (Dkt. 6.) The government verified this information with the defendant's PSO in Utah.

2016, property damage in 2016 (on a separate occasion), and criminal trespass in 2017. (Dkt. 6 at 4.)

At the time of his offense in Washington, D.C., the defendant had several other, open cases in Utah. He had a February 15, 2020 matter pending disposition for possession of controlled substances, a February 22, 2020 matter pending disposition for the violation of a protective order, and an August 5, 2020 matter pending disposition for possession of a firearm, driving without a license and possession of an open container of alcohol. The pendency of several cases did not deter the defendant from traveling to Washington, D.C. and assaulting law enforcement officers. In the February 15 matter, a warrant was issued on June 16, 2020 for the defendant's failure to appear; he did not appear again until February 8, 2021, after his arrest in another Utah case (described below). Records related to the August 5, 2020 matter reveal that when the defendant's car was stopped, the police smelled marijuana emanating from the vehicle, that the defendant was driving with a suspended license, that there was an open container of alcohol and a loaded .22 caliber rifle in the vehicle.

Then, on February 5, 2021, about one month after the Capitol riot, the defendant was stopped while driving and cited for speeding, driving on a suspended or revoked license, displaying the wrong plate, and for failure to provide proof of insurance. While the defendant was stopped, he became argumentative with law enforcement and claimed that he was being harassed. He was asked to step out of the vehicle and ordered to hand over his keys, but he refused, turned the vehicle on, and tried to roll up the driver's side window. Ultimately, the officer was able to arrest the defendant after shattering the window and ordering him out of the vehicle at gunpoint. During this traffic stop, the police officer observed a rifle with ammunition. It appears that the defendant was

not charged with a weapons offense because the officer could not determine whether there were conditions prohibiting him from possessing the weapon.

The defendant has abundantly demonstrated, through his past conduct, that he does not respect the government's lawful authority and will not comply with it. This factor weighs strongly in favor of pretrial detention.

### d. The Nature and Seriousness of the Danger to Any Other Person and the Community

The facts discussed above show that, if released, the defendant would represent an ongoing danger to other people and the community. Showing no remorse for his threats to his PSO, his release would present a risk of further harassment and threats. If he failed to comply with court conditions, and law enforcement officers were sent to arrest the defendant, he would represent a risk to those law enforcement officers. After all, he was not shy about attacking officers on January 6, nor has he been shy about defending his behavior. He perceives law enforcement authority as illegitimate when he does not agree with its exercise, and views arrests—including his own arrest—as illegitimately "stealing" people from their lives.

The defendant's housing would exacerbate the risk to law enforcement, should they be placed in a position to arrest him. The defendant lives in multifamily housing in a remote part of Utah. It would be extremely challenging for the defendant's PSO to perform any sort of compliance check at the defendant's home, especially to see whether drugs or firearms are stored inside, and, if they are, who possesses them.

### 2. Revocation of Release Pursuant to 18 U.S.C. § 3148(b)

When the defendant threatened his PSO, he also violated the terms of his supervised release by committing an additional criminal offense. The Court may order him detained, pursuant to 18 U.S.C. § 3148(b), if it finds probable cause that he did so, and then either finds that there is no

condition or combination of conditions that will assure the defendant will not flee or pose a danger to any other person and the community, or finds that he is unlikely to abide by any condition or combination of conditions of supervised release. Although only one of those factors is necessary, the defendant's conduct and history supports a finding as to both. The facts and arguments which support revocation overlap with those set forth above. For clarity of the record, the government summarizes those arguments without repeating them in full.

### a. Probable Cause to Believe that the Defendant Has Committed a Crime While on Release

The Court has a clear basis to find probable cause that the defendant has committed a crime while on release: his threats to his PSO. The PSO's sworn statement about the defendant's words, together with the circumstances of his behavior on May 6, 2021, clearly make out a threat. Such testimony is corroborated by the Court's own experience: it heard the defendant's words and his anger throughout the afternoon; those interactions immediately preceded the defendant's threat. And the threat was plainly made against a federal officer while he was engaged in the performance of his official duties, and on account of his official duties. 18 U.S.C. §§ 111(a)(1), 1114.

While the defendant denied (to the media) that his words constituted a threat, he admitted to saying words that closely mirrored the words reported by the PSO. Importantly, the defendant admitted saying that he would "eat [the PSO]'s flesh for nutrients." It is impossible to see this as anything but a threat. This factor is met.

### b. There is No Condition or Combination of Conditions That Will Assure that the Defendant Will Not Pose a Danger to the Safety of Any Other Person and the Community

This factor overlaps in substance with the finding called for by 18 U.S.C. § 3142(e). For all of the reasons already articulated, this factor is met.

### c. The Defendant is Unlikely to Abide by Any Condition or Combination of Conditions of Release

Although the defendant's threat and dangerousness are sufficient to revoke his pretrial release, the Court also should find that the defendant is unlikely to abide by any condition or combination of conditions of release. At a minimum, the defendant appears not to possess a valid driver's license but has shown through his conduct that he will not stop driving. He has also shown through his conduct that will continue to possess marijuana, which is a federal offense. He committed the instant offense while on release pending multiple other matters. He has told the media that all pretrial restrictions on his liberty are a deprivation of his due process and are illegitimate. He has invented false stories about police conduct on Capitol grounds to justify his behavior there. And the defendant was under supervision by his PSO for all of two days before threatening his PSO. The defendant has demonstrated his unwillingness to comply with any condition of release; the Court should believe him.

## C.  Conclusion

For the reasons stated above, the Court should find that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of any other person and the community, pursuant to 18 U.S.C. § 3142(e). Alternately, or additionally, the Court should order the defendant's pretrial release revoked, pursuant to 18 U.S.C. § 3148(b). Either way, the Court should order the defendant detained pending trial.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:    */s/ Michael J. Romano*
MICHAEL J. ROMANO
Trial Attorney, Detailee
IL Bar No. 6293658
555 4th Street, N.W.
Washington, D.C. 20530
202-307-6691
michael.romano@usdoj.gov